# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
|     **Plaintiff,** | )     <u>**VERIFIED COMPLAINT**</u> |
| | ) |
|     **- v.-** | ) |
| | )     Civil No._____ |
| **THE M/Y GALACTICA STAR, BEING A** | ) |
| **65-METER MOTOR YACHT BUILT BY** | ) |
| **HEESEN SHIPYARDS WITH** | ) |
| **INTERNATIONAL MARITIME** | ) |
| **ORGANIZATION NUMBER 9679830,** | ) |
| **AND REGISTERED UNDER THE LAWS** | ) |
| **AND FLAG OF THE CAYMAN ISLANDS** | ) |
| **AT THE PORT OF GEORGE TOWN,** | ) |
| **INCLUDING ALL FIXTURES, FITTINGS,** | ) |
| **MANUALS, STOCKS, STORES,** | ) |
| **INVENTORIES, AND EACH LIFEBOAT,** | ) |
| **TENDER, AND OTHER** | ) |
| **APPURTENANCE THERETO,** | ) |
| **INCLUDING, BUT NOT LIMITED TO,** | ) |
| **THE TENDER BOAT RECORDED AS A** | ) |
| **7.5 METER DARIEL "GUEST TENDER"** | ) |
| **WITH ID/SERIAL NO. DRLDT759G313,** | ) |
| **AND ANY PROPERTY TRACEABLE** | ) |
| **THERETO;** | ) |
| | ) |
| **ANY AND ALL FUNDS, PROCEEDS,** | ) |
| **CASH, OR BENEFITS TO BE** | ) |
| **DISBURSED OR OTHERWISE OWING** | ) |
| **TO ONE57 79 INC., OR TO ITS** | ) |
| **SUCCESSORS OR ASSIGNS, OUT OF** | ) |
| **ANY SURPLUS FUNDS RESULTING** | ) |
| **FROM THE FORECLOSURE AUCTION,** | ) |
| **TO BE HELD ON OR ABOUT JULY 19,** | ) |
| **2017,  OF REAL PROPERTY LOCATED** | ) |
| **IN NEW YORK, N.Y., AND COMMONLY** | ) |
| **KNOWN AS 157 WEST 57TH STREET,** | ) |
| **UNIT 79, NEW YORK, N.Y. 10019;** | ) |
| | ) |
| **REAL PROPERTY LOCATED IN NEW** | ) |
| **YORK, N.Y., COMMONLY KNOWN AS** | ) |

**1049 FIFTH AVENUE, UNITS 11B AND**　　)
**12B, NEW YORK, N.Y. 10032, AND ALL**　　)
**APPURTENANCES, IMPROVEMENTS,**　　)
**AND ATTACHMENTS LOCATED**　　)
**THEREON, AND ANY PROPERTY**　　)
**TRACEABLE THERETO;**　　)
　　)
**REAL PROPERTY LOCATED IN**　　)
**MONTECITO, CALIF., COMMONLY**　　)
**KNOWN AS 807 CIMA DEL MUNDO**　　)
**ROAD, MONTECITO, CALIF. 90077,**　　)
**AND ALL APPURTENANCES,**　　)
**IMPROVEMENTS, AND**　　)
**ATTACHMENTS LOCATED THEREON,**　　)
**AND ANY PROPERTY TRACEABLE**　　)
**THERETO;**　　)
　　)
**REAL PROPERTY LOCATED IN**　　)
**MONTECITO, CALIF., COMMONLY**　　)
**KNOWN AS 815 CIMA DEL MUNDO**　　)
**ROAD, MONTECITO, CALIF. 90077,**　　)
**AND ALL APPURTENANCES,**　　)
**IMPROVEMENTS, AND**　　)
**ATTACHMENTS LOCATED THEREON,**　　)
**AND ANY PROPERTY TRACEABLE**　　)
**THERETO;**　　)
　　)
**ALL RIGHTS AND INTERESTS HELD**　　)
**BY RIVERMOUNT INTERNATIONAL**　　)
**LTD., OR ITS AFFILIATES OR**　　)
**ASSIGNEES, IN THE SUBORDINATED**　　)
**CONVERTIBLE PROMISSORY NOTE**　　)
**EXECUTED BETWEEN CROSS**　　)
**HOLDINGS, INC., AND RIVERMOUNT**　　)
**INTERNATIONAL LTD., DATED ON OR**　　)
**ABOUT JULY 15, 2015, AS VARIED OR**　　)
**AMENDED BY THE PARTIES**　　)
**THERETO, AND ALL PROPERTY**　　)
**TRACEABLE THERETO;**　　)
　　)
　　　　**Defendants *In Rem***　　)
───────────────────────────　　)

Comes now the Plaintiff, the United States of America, through its undersigned attorneys, and alleges, upon information and belief, as follows:

## I.

## NATURE OF THE ACTION

1.      This is an action *in rem* to forfeit approximately $144 million in assets, and any property traceable thereto, derived from an international conspiracy to obtain lucrative business opportunities in the Nigerian oil and gas sector in return for corruptly offering and giving millions of dollars' worth of gifts and benefits to the former Nigerian Minister for Petroleum Resources, Diezani Alison-Madueke ("ALISON-MADUEKE"); and to subsequently launder the proceeds of the illicit business opportunities into and through the United States.

2.      From in or about April 2010 until in or about May 2015, ALISON-MADUEKE— who was often referred to as "the Madam" or "Madam D"—was Nigeria's Minister for Petroleum Resources.   In that role, she was responsible for overseeing Nigeria's state-owned oil company, the Nigerian National Petroleum Corporation ("NNPC").

3.      As alleged herein, Kolawole Akanni Aluko ("ALUKO"), Olajide Omokore ("OMOKORE"), and others: (i) conspired to and did purchase millions of dollars in real estate in and around London, U.K., for the use and benefit of ALISON-MADUEKE and her family; (ii) conspired to and did provide more than one million dollars in furniture, artwork, and other furnishings purchased within the Southern District of Texas, and shipped, in part, to London and Abuja, Nigeria, for the use and benefit of ALISON-MADUEKE and her family; and (iii) conspired to and did otherwise fund a lavish and privileged lifestyle for ALISON-MADUEKE and her family.

4.      As further alleged herein, ALISON-MADUEKE, in return for such improper inducements, used her influence as the Minister for Petroleum Resources to steer to companies beneficially owned by ALUKO and OMOKORE the award of multiple Strategic Alliance Agreements ("SAAs") with an NNPC subsidiary.

5.      As further alleged herein, the companies that received these SAAs were unqualified and either improperly performed their obligations or, in some instances, failed entirely to perform. Nevertheless, these companies received more than $1.5 billion in revenues through the sale of Nigerian crude oil.

6.      As further alleged herein, ALUKO and OMOKORE laundered their illicit revenues into and through the United States and, in particular, used these revenues to acquire the Defendants *In Rem*.

7.      As further alleged herein, ALUKO and OMOKORE used a series of shell companies and layered financial transactions to conceal the nature, location, source, and/or ownership of the proceeds of the unlawful conduct and of the Defendants *In Rem* purchased with such proceeds.

8.      As property constituting, derived from, or traceable to the proceeds of "specified unlawful activity," as that term is defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit "specified unlawful activity," and as property involved in money laundering violations of 18 U.S.C. §§ 1956 and 1957, the Defendants *In Rem* are subject to forfeiture under 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C).

## II.

## THE DEFENDANTS *IN REM*

9.      This is an action by the United States of America seeking forfeiture of all right,

title, and interest in the following property (collectively, the "Defendants *In Rem*"):

(a)     The M/Y Galactica Star, being a 65-meter motor yacht built by Heesen
        Shipyards with International Maritime Organization number 9679830, and
        registered in the Cayman Islands at the Port of George Town, including all
        fixtures, fittings, manuals, stocks, stores, inventories, and each lifeboat,
        tender, and other appurtenance thereto, including, but not limited to, the
        tender boat recorded as a 7.5 meter Dariel "guest tender" with ID/Serial No.
        DRLDT759G313, and any property traceable thereto (hereinafter the
        "GALACTICA STAR");

(b)     any and all funds, proceeds, cash, or benefits to be disbursed or otherwise
        owing to One57 79 Inc., or to its successors or assigns, out of any surplus
        funds resulting from the foreclosure auction to be held on or about July 19,
        2017, of real property located in New York, N.Y., and commonly known as
        157 West 57th Street, Unit 79, New York, N.Y. 10019, as more fully
        described in Attachment A (hereinafter the "157 WEST 57TH STREET
        SURPLUS PROCEEDS");

(c)     real property located in New York, N.Y., commonly known as 1049 Fifth
        Avenue, Units 11B and 12B, New York, N.Y. 10032, as more fully
        described in Attachment B, and all appurtenances, improvements, and
        attachments located thereon, and any property traceable thereto (hereinafter
        the "1049 FIFTH AVENUE UNITS");

(d)     real property located in Montecito, Calif., commonly known as 807 Cima
        del Mundo Road, Montecito, Calif. 90077, as more fully described in
        Attachment C, and all appurtenances, improvements, and attachments
        located thereon, and any property traceable thereto (hereinafter "807 CIMA
        DEL MUNDO ROAD");

(e)     real property located in Montecito, Calif., commonly known as 815 Cima
        del Mundo Road, Montecito, Calif. 90077, as more fully described in
        Attachment D, and all appurtenances, improvements, and attachments
        located thereon, and any property traceable thereto (hereinafter "815 CIMA
        DEL MUNDO ROAD");

(f)     all rights and interests held by Rivermount International Ltd., or its affiliates
        or assignees, in the Subordinated Convertible Promissory Note executed
        between Cross Holdings, Inc., and Rivermount International Ltd., dated on
        or about July 15, 2015, as varied or amended by the parties thereto, and all

5

property traceable thereto (hereinafter the "CROSS HOLDINGS PROMISSORY NOTE").

## III.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1355(a).

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to forfeiture took place in the Southern District of Texas.

12.     This action *in rem* for forfeiture is governed by 18 U.S.C. §§ 981 and 983, the Federal Rules of Civil Procedure, and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

## IV.

## STATUTORY BASIS FOR FORFEITURE

13.     The Defendants *In Rem* are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because they constitute or are derived from proceeds traceable to a violation of an offense constituting a "specified unlawful activity" or a conspiracy to commit such an offense. "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include an offense against a foreign nation involving "bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official," *see* 18 U.S.C. § 1956(c)(7)(B)(iv); any felony violation of the Foreign Corrupt Practices Act ("FCPA"), *see* 18 U.S.C. § 1956(c)(7)(D); or any violations of 18 U.S.C. §§ 1343 (wire fraud), 2314 (interstate transportation of stolen property), and 2315 (interstate receipt of stolen property), *see* 18 U.S.C. §§ 1956(c)(7)(A) & 1961(1).

14.    The Defendants *In Rem* are also subject to forfeiture under 18 U.S.C. § 981(a)(1)(A) because they constitute property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957, or are traceable to such property.  Section 1957 prohibits the conducting of a monetary transaction with property valued at over $10,000 that is known to be criminally derived and which constitutes the proceeds of "specified unlawful activity," including the proceeds of an offense against a foreign nation involving "bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official," *see* 18 U.S.C. § 1956(c)(7)(B)(iv); of any felony violation of the FCPA, *see* 18 U.S.C. § 1956(c)(7)(D); or of any violations of 18 U.S.C. §§ 1343 (wire fraud), 2314 (interstate transportation of stolen property), and 2315 (interstate receipt of stolen property), *see* 18 U.S.C. §§ 1956(c)(7)(A) & 1961(1).

15.    The Defendants *In Rem* are further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because they constitute property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(1)(B), or are traceable to such property.  Section 1956(a)(1)(B) prohibits the conducting of a financial transaction with property known to be the proceeds of unlawful activity with the intent to conceal the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity, including the proceeds of an offense against a foreign nation involving "bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official," *see* 18 U.S.C. § 1956(c)(7)(B)(iv); of any felony violation of the FCPA, *see* 18 U.S.C. § 1956(c)(7)(D); or of any violations of 18 U.S.C. §§ 1343 (wire fraud), 2314 (interstate transportation of stolen property), and 2315 (interstate receipt of stolen property), *see* 18 U.S.C. §§ 1956(c)(7)(A) & 1961(1).

16.     The Defendants *In Rem* are further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because they constitute property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(2), or are traceable to such property.  Section 1956(a)(2) prohibits transferring funds known to be the proceeds of unlawful activity from a place outside the United States to a place in the United States, with knowledge that the transfer is designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity, including the proceeds of an offense against a foreign nation involving "bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official," *see* 18 U.S.C. § 1956(c)(7)(B)(iv); of any felony violation of the FCPA, *see* 18 U.S.C. § 1956(c)(7)(D); or of any violations of 18 U.S.C. §§ 1343 (wire fraud), 2314 (interstate transportation of stolen property), and 2315 (interstate receipt of stolen property), *see* 18 U.S.C. §§ 1956(c)(7)(A) & 1961(1).

17.     The Defendants *In Rem* are further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because they constitute property involved in a conspiracy to violate 18 U.S.C. §§ 1956 or 1957, in violation of 18 U.S.C. § 1956(h).

18.     A representative selection of relevant offenses against a foreign nation as referred to in ¶¶ 13-17 are set forth in Attachment E.

**V.**

**RELEVANT PERSONS AND ENTITIES**

19.     On information and belief, the United States alleges the following facts.

20.     **Diezani ALISON-MADUEKE** is the former Nigerian Minister for Petroleum Resources who served in that position from in or about April 2010 through in or about May 2015. In that role, ALISON-MADUEKE was responsible for overseeing NNPC.  In her capacity as

8

Minister for Petroleum Resources, ALISON-MADUEKE was a "foreign official" as that term is defined in the FCPA, *see* 15 U.S.C. §§ 78dd-1(f)(1)(A), 78dd-2(h)(2)(A), and 78dd-3(f)(2)(A).

21.     The **Nigerian National Petroleum Corporation** is Nigeria's state-owned oil corporation through which the Federal Government of Nigeria regulates and participates in the country's petroleum and hydrocarbons industry.  The NNPC was owned and controlled by the Nigerian government and performed government functions, and thus was an "instrumentality" within the meaning of the FCPA, *see* 15 U.S.C. §§ 78dd-1(f)(1)(A), 78dd-2(h)(2)(A), and 78dd-3(f)(2)(A).

22.     The **Nigerian Petroleum Development Company** ("**NPDC**") is the wholly-owned operating subsidiary of NNPC.  The NPDC was owned and controlled by the Nigerian government and performed government functions, and thus was an "instrumentality" within the meaning of the FCPA, *see* 15 U.S.C. §§ 78dd-1(f)(1)(A), 78dd-2(h)(2)(A), and 78dd-3(f)(2)(A).

23.     **Kolawole Akanni ALUKO** is a Nigerian citizen whose last known residential address was in Porza-Lugano, Switzerland.  ALUKO and OMOKORE (see below) are the beneficial owners of and have control over ATLANTIC ENERGY HOLDINGS LTD. along with that company's subsidiaries and affiliates—including ATLANTIC ENERGY DRILLING CONCEPTS NIGERIA LTD. and ATLANTIC ENERGY BRASS DEVELOPMENT LTD. ALUKO was also, at all times relevant to this complaint, a director and beneficial owner of TENKA LTD. and is the 100% owner of EARNSHAW ASSOCIATES LTD.

24.     **Olajide OMOKORE** is a Nigerian citizen living in Lagos, Nigeria, and is a business partner of ALUKO.  With ALUKO, OMOKORE is a beneficial owner of and has control over ATLANTIC ENERGY HOLDINGS LTD. along with that company's subsidiaries and

affiliates—including ATLANTIC ENERGY DRILLING CONCEPTS NIGERIA LTD. and ATLANTIC ENERGY BRASS DEVELOPMENT LTD.

25.     **ATLANTIC ENERGY HOLDINGS LTD.** ("**AEH**") is a company incorporated in the British Virgin Islands with registered address of 325 Waterfront Drive, Omar Hodge Building, Wickham's Cay, Road Town, Tortola, B.V.I.  AEH is beneficially owned, directly or indirectly, by ALUKO and OMOKORE.

26.     **ATLANTIC ENERGY (BRASS) LTD.** is a company incorporated in the British Virgin Islands with the same registered address as AEH:  325 Waterfront Drive, Omar Hodge Building, Wickham's Cay, Road Town, Tortola, B.V.I.  Upon information and belief, ATLANTIC ENERGY (BRASS) LTD. is beneficially owned, directly or indirectly, by ALUKO and OMOKORE.

27.     **ATLANTIC ENERGY DRILLING CONCEPTS NIGERIA LTD.** ("**AEDC**") is a company incorporated in Nigeria with registered address of Plot 1267 Ahmadu Bello Way, Garki, Abuja, Nigeria.  OMOKORE is a registered director of AEDC.  AEH owns 49,999,999 of 50,000,000 shares of AEDC.

28.     **ATLANTIC ENERGY BRASS DEVELOPMENT LTD.** ("**AEBD**") is a company incorporated in Nigeria with registered address of 32A Ademola Adetokunbo Street, Victoria Island, Lagos, Nigeria.  OMOKORE is a registered director of AEBD.  ATLANTIC ENERGY (BRASS) LTD. owns 9,999,999 of 10,000,000 shares of AEBD.

29.     **TENKA LTD.** ("**TENKA**") is a company incorporated in the United Kingdom with registered address of No. 1 London Bridge, London SE1 9BG, U.K.  During all times relevant to this complaint, the directors of TENKA were ALUKO and his wife.  Upon information and belief, TENKA is beneficially owned by ALUKO.

30.    **EARNSHAW ASSOCIATES LTD.** ("**EARNSHAW**") is a company incorporated in the British Virgin Islands with registered address of 24 De Castro Street, Akara Building, Wickham's Cay 1, Road Town, Tortola, B.V.I.  ALUKO owns 100% of EARNSHAW.

31.    **CO-CONSPIRATOR #1** is a dual citizen of the United States and Nigeria whose principal residence is in Topanga, Calif.

32.    **CO-CONSPIRATOR #2** is a Nigerian citizen and a former resident of the United States who maintained a residence in Potomac, Md.

33.    **CO-CONSPIRATOR #3** is a dual citizen of the United States and Nigeria and a former resident of the United States who maintained a residence in Oakland, Calif.

## VI.

## FACTS

**A.    Strategic Alliance Agreements and Oil Mining Leases**

34.    Prior to 2010, NNPC participated in a joint venture with the subsidiary of a major international oil company (the "IOC Subsidiary") for the development and production of oil and gas in connection with eight oil mining leases ("OMLs").  In particular, the joint venture held interests in and operated OMLs 26, 30, 34, and 42 (the "Forcados OMLs") and OMLs 60, 61, 62, and 63 (the "Brass OMLs").

35.    The IOC Subsidiary owned 45% of the joint venture, with the remainder owned by NNPC.  In 2010, however, the IOC Subsidiary chose to divest itself and sold its minority stake to various indigenous Nigerian entities.

36.    With the IOC Subsidiary's departure, NNPC became responsible for financing and operating the OMLs.  It assigned this task—along with its 55% majority stake—to its own operating subsidiary, NPDC.  However, NPDC lacked the in-house technical expertise and the

11

financial resources to fund and operate the OMLs.  NPDC therefore sought to enter into Strategic

Alliance Agreements to partner with outside parties who could both finance and provide technical

assistance for the operation of the OMLs on NPDC's behalf.

**B.     ALISON-MADUEKE Was Instrumental in the Award of the Lucrative Forcados SAAs (OMLs 26, 30, 34, and 42) to AEDC**

37.     AEDC was incorporated in Nigeria on or about July 19, 2010, approximately three

months after ALISON-MADUEKE was appointed Minister for Petroleum Resources.

38.     On or about March 8, 2011, AEDC first expressed its interest in entering into an

SAA in a letter to NPDC.  Less than three weeks later, on or about March 28, 2011, ALUKO,

acting on behalf of AEDC, attended a meeting with NPDC representatives to discuss a possible

SAA award.

39.     Within another three weeks, on or about April 20, 2011, AEDC and NPDC entered

into SAAs for OMLs 26 and 42.  These SAAs were signed by OMOKORE on behalf of AEDC.

40.     Approximately one month later, on or about May 25, 2011, AEDC and NPDC

entered into two more SAAs for OMLs 30 and 34.  These SAAs were also signed by OMOKORE

on behalf of AEDC.  (The four SAAs for OMLs 26, 30, 34, and 42 are herein collectively referred

to as the "Forcados SAAs.")

41.     NPDC's award of the Forcados SAAs to AEDC was done with the knowledge and

support of ALISON-MADUEKE and at her direction.  For example, in a recorded conversation

between ALISON-MADUEKE and ALUKO, ALISON-MADUEKE acknowledged that "we

stuck our necks out regarding the SAA and we supported it."  *See infra* ¶ 118.

42.     A February 2014 report prepared by the then-governor of the Central Bank of

Nigeria determined that AEDC "had neither the technical expertise nor the capital to develop the

joint venture, but [was] none-the-less able to lift crude and retain the proceeds . . . up to 70% of

12

the profit of the Joint Venture." The report concluded that the arrangement was set up "for the purpose of acquiring assets belonging to the [Federal Republic of Nigeria] and transferring the income to private hands."

### (1)   Terms of the Forcados SAAs

43.   The Forcados SAAs required AEDC to pay non-recoverable entry fees prior to the SAAs' taking effect. The value of the entry fees was to be determined based on the estimated probable oil and gas reserves within the area covered by the Forcados OMLs.

44.   In addition, the Forcados SAAs each required AEDC to pay $350,000 per year to NPDC for the first five years of the agreements. These funds were to be used for the provision of training facilities for NPDC staff.

45.   Finally, the Forcados SAAs required AEDC to "provide all the funds required for NPDC's 55% share of Petroleum Operating Costs." Upon information and belief, NPDC's share of the operating costs for the Forcados OMLs, during the period from March 2011 through December 2015, was at least $1,400,000,000.

46.   In return for meeting its obligations under the Forcados SAAs, AEDC would be entitled to recover the cost of financing NPDC's share of the operating costs (as described in the preceding paragraph) and would be further entitled to a share of NPDC's profit as determined by profit-sharing formulae contained in the SAAs.

47.   AEDC's entitlements were payable in-kind. That is, AEDC would receive allocations of available oil sufficient to cover the amounts due as cost-recovery and profit.

### (2)   AEDC's Performance Under the Forcados SAAs

48.   Upon information and belief, AEDC substantially failed to perform under the Forcados SAAs. In particular, upon information and belief, AEDC did not fulfill its requirement

to fund training facilities for NPDC staff, leading to an outstanding obligation of approximately $5,600,000.

49.     Furthermore, AEDC failed to cover NPDC's share of the Forcados operating costs. Upon information and belief, of the more than $1,400,000,000 required to finance such costs, AEDC made contributions of only approximately $305,108,522.43.

50.     Despite AEDC's failure to fulfil its obligations under the Forcados SAAs, AEDC was, upon information and belief, allocated and permitted to lift and sell, for its own benefit, twenty-one cargoes of crude oil valued at approximately $677,238,673.

## C.     ALUKO, OMOKORE, and Others Conspire to Purchase £11,530,000 Worth of London Real Estate for the Benefit of ALISON-MADUEKE

51.     Concurrent with the negotiations for and the award of the Forcados SAAs, ALUKO and OMOKORE, acting in concert with CO-CONSPIRATORS #1 and #2, purchased and refurbished several multi-million dollar properties in the London area for the benefit of ALISON-MADUEKE and her family members.  ALUKO, OMOKORE, and CO-CONSPIRATORS #1 and #2 provided these properties to ALISON-MADUEKE for the corrupt purpose of inducing her to use her influence within the Ministry of Petroleum Resources, the NNPC, and the NPDC to direct the award of business opportunities to entities under their control and beneficial ownership, including the award of the Forcados SAAs to AEDC.

### (1)     96 Camp Road, Gerrards Cross, Buckinghamshire, SL9 7PB

52.     On or about January 27, 2011, *i.e.*, less than two months before AEDC officially approached NPDC about the first of the Forcados SAAs, a Seychelles company named Miranda International Ltd. purchased a property known as "the Falls" for £3,250,000.  The Falls is located just outside London at 96 Camp Road, Gerrards Cross, Buckinghamshire SL9 7PB.

53.     Miranda International Ltd. is beneficially owned by OMOKORE.

14

54.     ALUKO engaged a construction company (the "Construction Company") to upgrade and maintain the plumbing, electrical, air conditioning, and audio-visual systems at the Falls.

55.     OMOKORE and ALUKO purchased and improved the Falls for the exclusive use of ALISON-MADUEKE and her family.

56.     A mobile telephone recovered at the known residences of ALISON-MADUEKE and her mother contained digital photographs of ALISON-MADUEKE present inside the Falls.

57.     Furthermore, during the relevant period, ALISON-MADUEKE—who was addressed at the property as "the Madam"—was the only person who occupied the property.

58.     Individuals who provided services at the Falls addressed its occupant as "the Madam" or were told that the person they worked for was known as "the Madam."

59.     Finally, on or about October 8, 2013, ALUKO used his American Express card to purchase two identical exercise machines at Harrods in London.  The machines were purchased for £10,926 each.  One was to be delivered to the known London address of ALISON-MADUEKE; the other was to be delivered to the Falls.

**(2)     39 Chester Close North, London NW1 4JE**

60.     On or about March 24, 2011—*i.e.*, just four days before ALUKO met with NPDC officials to discuss AEDC's interest in an SAA—a British Virgin Islands company called Mortlake Investments Ltd. was used to purchase real property at 39 Chester Close North, London NW1 4JE ("39 Chester Close North") for £1,730,000.

61.     Mortlake Investments Ltd. is beneficially owned by ALUKO.

62.    The real estate company Daniel Ford & Co. assisted in the purchase of 39 Chester Close North.  The same company assisted in the purchase of additional properties as detailed below.  *See infra* ¶¶ 65 & 70.

63.    ALUKO engaged the Construction Company to undertake extensive alterations and renovations at 39 Chester Close North, including the installation of an elevator.  An employee of the Construction Company ("Construction Company Employee #1") has stated that the intended occupants of 39 Chester Close North were ALISON-MADUEKE's mother and son.  Construction Company Employee #1 personally met ALISON-MADUEKE on at least two occasions at the property and, on one of those occasions, ALISON-MADUEKE selected stone flooring and countertops to be installed in the bathrooms.

64.    At some point in 2015, Construction Company Employee #1 was informed that ALISON-MADUEKE's mother and son would not be moving into 39 Chester Close North after all, and the Construction Company was instructed to remove the elevator and return the property to its original condition.  The property was sold on or about July 22, 2015, for £2,224,000.

**(3)    58 Harley House, Marylebone Road, London NW1 5HL**

65.    On or about March 28, 2011—*i.e.*, the same day ALUKO was meeting with NPDC officials to discuss AEDC's interest in an SAA—a Seychelles company, Rosewood Investments Ltd., was used to purchase real property at 58 Harley House, Marylebone Road, London NW1 5HL ("58 Harley House") for £2,800,000.

66.    Rosewood Investments Ltd. is beneficially owned by CO-CONSPIRATOR #2.

67.    The same real estate agency used to purchase 39 Chester Close North, *i.e.*, Daniel Ford & Co., assisted in the purchase of 58 Harley House.

68.     As with 39 Chester Close North, ALUKO engaged the Construction Company to provide renovation services at 58 Harley House.  On or about August 9, 2011, a second employee of the Construction Company ("Construction Company Employee #2") forwarded by email to ALUKO design plans for the kitchen at 58 Harley House.  ALUKO subsequently forwarded this email, including the design plans, to ALISON-MADUEKE.

69.     In addition, Construction Company Employee #1 was introduced to ALISON-MADUEKE at 58 Harley House, on which occasion the employee was told ALISON-MADUEKE was "the architect."

### (4)     Flat 5 Park View, 83-86 Prince Albert Road, London NW8 7RU

70.     On or about March 29, 2011—*i.e.*, the day after ALUKO met with NPDC officials to discuss AEDC's interest in an SAA—another Seychelles company called Colinwood Ltd. was used to purchase real property at Flat 5 Park View, 83-86 Prince Albert Road, London NW8 7RU ("Flat 5 Park View") for £3,750,000.  The purchase was financed, in part, by a loan obtained from FBN Bank (UK) Ltd. by CO-CONSPIRATOR #1.

71.     The same real estate company used to purchase 39 Chester Close North and 58 Harley House, *i.e.*, Daniel Ford & Co., also assisted in the purchase of Flat 5 Park View.

72.     As with both 39 Chester Close North and 58 Harley House, ALUKO engaged the Construction Company to perform significant renovations at Flat 5 Park View.  Construction Company Employee #1 personally met ALISON-MADUEKE at Flat 5 Park View where she was present for a discussion of interior design plans.  In addition, design plans for Flat 5 Park View were later found at the known London residence of ALISON-MADUEKE's mother.

**D.      Living and Lifestyle Expenses for ALISON-MADUEKE**

**(1)      Rental Payments**

73.      Beginning in August 2011 and continuing through January 2014, ALUKO and a company beneficially owned by him, Tracon Investments Ltd. ("Tracon"), made a total of at least £537,922 in rental payments for two central London residences both located at 22 St. Edmunds Terrace, London NW8 7QQ.  The first residence, Flat 19, was occupied by ALISON-MADUEKE during this time period.  The second residence, Flat 6, was occupied by ALISON-MADUEKE's mother during this time period.

74.      The rental payments were made in the following approximate amounts, on or about the following dates, from the following payors:

| TABLE 1 | | |
|---|---|---|
| **Date** | **Payor** | **Amount** |
| Aug. 30, 2011 | ALUKO | £49,000.00 |
| Dec. 14, 2011 | ALUKO | £10,216.00 |
| Dec. 14, 2011 | ALUKO | £44,811.00 |
| Feb. 24, 2012 | ALUKO | £39,347.50 |
| May 11, 2012 | ALUKO | £29,900.00 |
| May 11, 2012 | ALUKO | £39,347.50 |
| Sept. 12, 2012 | ALUKO | £87,075.00 |
| Feb. 4, 2013 | Tracon | £30,375.00 |
| Mar. 28, 2013 | ALUKO | £29,900.00 |
| Mar. 28, 2013 | ALUKO | £39,375.00 |
| June 21, 2013 | ALUKO | £30,375.00 |

| Sept. 30, 2013 | ALUKO | £70,000.00 |
|---|---|---|
| Jan. 22, 2014 | Tracon | £8,300.00 |
| Jan. 22, 2014 | Tracon | £29,900.00 |
| **TOTAL** | | **£537,922.00** |

75.     Upon information and belief, the above payments were made corruptly by, on behalf of, or at the direction of ALUKO for the purpose of benefiting ALISON-MADUEKE and her mother in return for ALISON-MADUEKE's having improperly influenced the award of the Forcados SAAs to AEDC and in anticipation of or in return for her improperly influencing the award of the Brass SAA, *see infra* ¶¶ 105-117, to AEDC and AEBD.

**(2)    Transportation Services**

76.     During the period from at least December 2012 through at least July 2014, ALUKO and his beneficially-owned company TENKA made at least £393,274.32 in payments to a car hire company (the "Chauffeur Company").  During that same time period, a company beneficially owned by OMOKORE, Energy Property Development Ltd., paid at least £4,424.40 to the Chauffeur Company.

77.     The payments were made to the Chauffeur Company in the following approximate amounts, on or about the following dates, by the following payors:

| **TABLE 2** | | |
|---|---|---|
| **Date** | **Payor** | **Amount** |
| Dec. 28, 2012 | ALUKO | £6,171.06 |
| Jan. 11, 2013 | TENKA | £6,115.92 |
| Feb. 14, 2013 | TENKA | £10,664.50 |

| Mar. 8, 2013 | TENKA | £25,000.97 |
| Apr. 8, 2013 | TENKA | £27,999.30 |
| June 7, 2013 | TENKA | £25,524.51 |
| June 11, 2013 | Energy Prop. Dev. | £1,475.22 |
| June 13, 2013 | Energy Prop. Dev. | £1,072.02 |
| July 8, 2013 | ALUKO | £77,605.78 |
| July 17, 2013 | Energy Prop. Dev. | £1,877.16 |
| Oct. 15, 2013 | ALUKO | £74,420.32 |
| Dec. 3, 2013 | TENKA | £4,410.48 |
| July 28, 2014 | TENKA | £35,362.48 |
| July 29, 2014 | TENKA | £99,999.00 |
| **TOTAL** | | **£397,698.72** |

78.     Upon information and belief, the above payments were made corruptly by, on behalf of, or at the direction of ALUKO and OMOKORE for the benefit of ALISON-MADUEKE and/or her family, in return for ALISON-MADUEKE's having improperly influenced the award of the Forcados SAAs to AEDC and in anticipation of or in return for her improperly influencing the award of the Brass SAA, *see infra* ¶¶ 105-117, to AEDC and AEBD.

79.     In particular, the director of the Chauffeur Company has stated that in or around June 2014 he was assaulted in the hallway outside of ALISON-MADUEKE's known residence at Flat 19, 22 St. Edmunds Terrace, London NW8 7QQ, by two men known by the director to be ALISON-MADUEKE's associates.   This assault occurred as the director of the Chauffeur

Company was attempting to deliver a letter concerning approximately £224,000 in unpaid services provided by his company to ALISON-MADUEKE.

80.     The director of the Chauffeur Company has further stated that, upon hearing the commotion, ALISON-MADUEKE herself appeared and instructed her associates to settle the unpaid bill.  As the preceding table indicates, roughly one month after the hallway assault, TENKA paid a total of £135,361.48 to the Chauffeur Company.

**E.     Furniture Purchases in Houston, Tex. for the Benefit of ALISON-MADUEKE**

**(1)     Purchases by OMOKORE and CO-CONSPIRATOR #1**

81.     An employee of a furniture store located within the Southern District of Texas in Houston, Tex., ("Houston Furniture Store #1") has stated that ALISON-MADUEKE visited his showroom on multiple occasions.  During those visits, ALISON-MADUEKE would identify specific items of interest to her, which the employee ("Furniture Store Employee") would photograph.  During her various visits to Houston, ALISON-MADUEKE would spend many hours over the course of two or three days reviewing furniture in Houston Furniture Store #1.  Afterward, the Furniture Store Employee would visit ALISON-MADUEKE at her hotel room in Houston to review the photographed items.  ALISON-MADUEKE would then narrow down the selections to those she wished to be purchased.

82.     ALISON-MADUEKE's purchases were always paid for by someone else.  In particular, the Furniture Store Employee recalled that CO-CONSPIRATOR #1 was the first person to visit the store and to pay for ALISON-MADUEKE's selections.

83.     Upon information and belief, ALISON-MADUEKE was present in Houston, Tex., to deliver a keynote address at Rice University in late September 2010, departing Houston for Nigeria on September 29, 2010.  This trip occurred roughly five months after ALISON-

21

MADUEKE assumed her role as Minister for Petroleum Resources and roughly two months after the incorporation of AEDC.

84.     Coinciding with ALISON-MADUEKE's visit to Houston, CO-CONSPIRATOR #1 charged $12,867 and $25,000 in two separate transactions at Houston Furniture Store #1 on or about September 27, 2010.  On or about October 7, 2010, CO-CONSPIRATOR # 1 charged an additional $3,022 at Houston Furniture Store #1.  Upon information and belief, these purchases comprised items selected by ALISON-MADUEKE and were intended for her benefit.

85.     In or around the same time as the purchases made at Houston Furniture Store #1, CO-CONSPIRATOR #1 also made significant purchases at another Houston furniture showroom ("Houston Furniture Store #2").  In particular, a Nevada-based limited partnership under the control of CO-CONSPIRATOR #1 wired a total of $197,600 to Houston Furniture Store #2 in two separate transactions on or about September 30, 2010, and October 1, 2010.  Upon information and belief, these payments were in settlement of approximately $200,000 worth of purchases signed for by OMOKORE on or about September 27, 2010, at Houston Furniture Store #2.

86.     Subsequently, on October 7, 2010, Houston Furniture Store #2 drew up two additional sales invoices in OMOKORE's name in the total amount of $23,703.50.  On the following day, October 8, 2010, CO-CONSPIRATOR #1 emailed photographs of the items listed on these additional sales invoices directly to ALISON-MADUEKE.  On October 9, 2010, ALISON-MADUEKE responded by email to CO-CONSPIRATOR #1:  "thx.  cabinet is the correct one."

87.     Subsequently, on October 13, 2010, CO-CONSPIRATOR #1 authorized Houston Furniture Store # 2 to charge his Nevada company another $23,703.50 as payment for the

additional furniture purchases made in OMOKORE's name and discussed, via email, directly with ALISON-MADUEKE.

88.     Upon information and belief, in October 2010 CO-CONSPIRATOR #1 arranged with Houston Furniture Store #1 to combine the recent purchases made by himself and OMOKORE from both stores and to ship the merchandise to OMOKORE in Lagos, Nigeria.

89.     At least one of the items purchased in OMOKORE's name, and paid for by CO-CONSPIRATOR #1, has been matched by vendor number, item number, and store-issued control number to furniture discovered in ALISON-MADUEKE's residence in Abuja, Nigeria.

90.     Upon information and belief, OMOKORE and CO-CONSPIRATOR #1 made their purchases at Houston Furniture Stores #1 and #2 in and around September and October 2010 and subsequently arranged for the shipment of certain of those purchases to Nigeria for the corrupt purpose of benefitting ALISON-MADUEKE and inducing her to improperly influence the award of, *inter alia*, the Forcados SAAs to AEDC.

**(2)     Purchases by CO-CONSPIRATORS #2 and #3**

91.     On or about May 3, 2011, CO-CONSPIRATOR #2 purchased a total of $53,636.79 worth of furniture from Houston Furniture Store #2.  These purchases included, among other things, the following items:

| TABLE 3 | | |
|---|---|---|
| **Control No.** | **Description** | **Price (w/o tax)** |
| 1564774 | Luigi XVI Sideboard | $10,829.00 |
| 1373385 | George III Console | $2,999.00 |
| 1479702 | Jappaned Secretaire | $5,508.00 |

92.     CO-CONSPIRATOR #2 returned to Houston Furniture Store #2 on or about the following day, *i.e.*, May 4, 2011, and purchased another $53,890.08 worth of merchandise.

93.     On March 31, 2012, CO-CONSPIRATOR #3 purchased $27,068.99 worth of merchandise at Houston Furniture Store #2.  On or about April 4, 2012, CO-CONSPIRATOR #3 returned and purchased another $5,756.73 worth of merchandise from the same store.

94.     In or around May 2012, the items purchased by CO-CONSPIRATORS #2 and #3, as described in ¶¶ 91-93, were pooled into two shipping containers and shipped to the attention of CO-CONSPIRATOR #3 in London.  The descriptions and control numbers contained on the packing lists match exactly the descriptions and control numbers on the sales records of Houston Furniture Store #2, including those specifically identified in Table 3 above.  The total value of the shipped furniture, exclusive of sales tax or shipping fees, was $123,987.

95.     On or about August 23, 2012, a representative of a U.K. moving and storage company emailed the Construction Company Employee #1 regarding "[CO-CONSPIRATOR #3]'s Containers."  Construction Company Employee #1 forwarded this email to ALUKO.

96.     Subsequently, the Construction Company assisted in the delivery of multiple items of furniture to 58 Harley House, including the three items identified in Table 3 above.

97.     Thus, ALUKO and CO-CONSPIRATORS #2 and #3 conspired to and did purchase furniture from Houston Furniture Store #2 and arranged for the shipment and delivery of some portion of those items to 58 Harley House, a property that ALUKO and CO-CONSPIRATORS #2 and #3 had previously purchased and refurbished for the benefit and use of ALISON-MADUEKE and her family.

98.     Upon information and belief, ALUKO and CO-CONSPIRATORS #2 and #3 undertook to purchase and deliver furniture to 58 Harley House for the corrupt purpose of inducing

ALISON-MADUEKE to use her influence, or rewarding her for having used her influence, within the Nigerian Ministry for Petroleum Resources, NNPC, and NPDC to direct the award of business opportunities to entities under the control of ALUKO and CO-CONSPIRATORS #2 and #3, including the award of the Forcados SAAs and the Brass SAA to AEDC and AEBD.

      (3)     **Purchases by ALUKO**

99.     The Furniture Store Employee further recalled that ALUKO visited the Houston store to pay for some of ALISON-MADUEKE's selections, and the Furniture Store Employee kept ALUKO's cellular telephone number in his own telephone under the descriptor "Kola Aluko Madame D."

100.     On or about May 4, 2012, ALUKO purchased $446,607.29 worth of goods from Houston Furniture Store #1. Later that month, in payment for his May 4, 2012, purchases, ALUKO wired $461,500 to Houston Furniture Store #1 from a bank account ending in -090038 held in his name at LGT Bank (Schweiz) AG in Switzerland (the "LGT -090038 Account").

101.     Also on May 4, 2012, ALUKO purchased an additional $262,091.47 worth of furniture at Houston Furniture Store #2. On June 1, 2012, ALUKO wired $280,595.81 to Furniture Store #2 from his LGT -090038 Account as payment for the purchases.

102.     In or around March 2013, Houston Furniture Store #1 arranged a shipment of furniture comprising a subset of items from ALUKO's May 2012 purchases at both Houston Furniture Store #1 and Furniture Store #2. The shipment was sent from Houston to Lagos, Nigeria. The consignee was Chijioke Isiolu. Upon information and belief, Isiolu is a Nigerian attorney who represents OMOKORE.

103.     At least one item of furniture purchased by ALUKO as part of his May 4, 2012, purchases from Houston Furniture Store #2 has been matched by vendor number, item number,

and store-issued control number to furniture discovered in the Abuja residence of ALISON-MADUEKE.

104.    Upon information and belief, ALUKO made his May 2012 purchases at Houston Furniture Stores #1 and #2 and arranged for the shipment of certain of those purchases to Nigeria in or around March 2013 for the corrupt purpose of benefitting ALISON-MADUEKE in return for ALISON-MADUEKE's having improperly influenced the award of the Forcados SAAs to AEDC and in anticipation of or in return for her improperly influencing the award of the Brass SAA, *see infra* ¶¶ 105-117, to AEDC and AEBD.

**F.    The Brass SAA (OMLs 60, 61, 62, and 63)**

105.    On or about December 17, 2012—*i.e.*, while ALUKO, OMOKORE, and CO-CONSPIRATORS #1, #2, and #3 were in the midst of purchasing and refurbishing multiple high-value properties for the use and benefit of ALISON-MADUEKE and otherwise financing her living and lifestyle expenses—NPDC awarded to AEDC a new SAA for OMLs 60, 61, 62, and 63 (the "Brass SAA").

106.    On or about February 14, 2013, AEDC entered into a novation agreement pursuant to which it transferred all of its rights and obligations under the Brass SAA to AEBD.

**(1)    Terms of the Brass SAA**

107.    The Brass SAA, like the earlier Forcados SAAs, imposed certain obligations on AEBD and, in return, entitled AEBD to a share of the oil and gas produced under the Brass OMLs.

108.    In particular, the Brass SAA required AEBD to pay a non-recoverable entry fee. Per the terms of the SAA, the value of the entry fee was to be determined based on the estimated probable oil and gas reserves within the area covered by the Brass OMLs.  Upon information and belief, the entry fee should have been at least $120,000,000.

109.    Per the terms of the Brass SAA, commencement of the agreement was contingent "upon the payment of the entry fee by ATLANTIC," *i.e.*, by AEDC or, after the novation, AEBD.

110.    In addition, the Brass SAA required AEBD to pay $350,000 per year to NPDC for the first five years of the agreement for the provision of training facilities for NPDC staff.

111.    Finally, the Brass SAA required AEBD "to provide all funds required by NPDC's 60% share of Petroleum Operating Costs."  Upon information and belief, NPDC's share of the operating costs for the Brass OMLs, during the period from December 2012 through December 2015, was at least $1,700,000,000.

112.     In return for meeting its obligations under the Brass SAA, AEBD would be entitled to recover the cost of financing NPDC's share of the operating costs (as described in the preceding paragraph) and would be further entitled to a share of NPDC's profit as determined by a profit-sharing formula contained in the SAA.

113.    AEBD's entitlements were payable in kind.  That is, AEBD would receive allocations of available oil sufficient to cover the amounts due as cost-recovery and profit.

**(2)    AEBD's Performance Under the Brass SAA**

114.    Both AEBD and AEDC failed entirely to meet their obligations under the Brass SAA.  Neither company ever paid the required entry fee; neither company ever made payments towards the NPDC training facilities; and neither company provided any funds to finance NPDC's share of the operating costs of the OMLs.

115.    Despite this complete failure of AEBD and AEDC to meet any of their obligations under the Brass SAA, NPDC nevertheless allocated to AEBD fifteen cargoes of oil, comprising more than 7,000,000 barrels of crude oil.  Over the course of a year, AEBD subsequently sold

these allocations to Glencore Energy UK Ltd. ("Glencore") for $811,297,883.11, collectively.[1]  As detailed below, *see infra* Table 6, Glencore's payments to AEBD occurred between April 5, 2013, and April 8, 2014.

116.    Rather than use the proceeds of its oil liftings to meet its obligations under the Brass SAA, AEBD retained the revenues and diverted them for the benefit of ALUKO and OMOKORE, and, upon information and belief, for the benefit of ALISON-MADUEKE.

117.    Upon information and belief, neither ALUKO nor OMOKORE ever intended to fulfill their or their companies' obligations under the Brass SAA but, nevertheless, with the assistance of ALISON-MADUEKE, induced NPDC to enter into the agreement under the false and fraudulent pretense that they intended to and would fulfill their obligations.

## G.    ALISON-MADUEKE's Recorded Conversation with ALUKO

118.    On or about May 14, 2014, ALISON-MADUEKE recorded a conversation between herself and ALUKO.  In the conversation, ALISON-MADUEKE acknowledged her role in steering SAAs to AEDC.

ALISON-MADUEKE:    You and Jide [*i.e.*, OMOKORE] had some of the most support that we could possibly give.  At a time when we're not doing anything else, we stuck our necks out regarding the SAA and we supported it.  [INAUDIBLE] How the two of you have ruined it is incredulous and incredible to all of us.

I spoke to you several times about your general behavior, acquisition of assets, etc., asking you to be a bit more careful because [INAUDIBLE] will start following you.  I remember we had this open discussion more than once.  You kept telling me that there was no issue because you did it in a certain way, you did it in a certain—and I kept telling you that it doesn't matter how you do it.  Once you start acquiring, acquiring, acquiring at a certain level, then you'll be—whether you like it or not, whether it was done in the most transparent—you understand?—

---

[1] Glencore, according to its website, is a "one of the world's largest global diversified natural resource companies."

manner or not, because they will want to trace where it came from. This is an age of terrorism.

119.   In particular, ALISON-MADUEKE criticized ALUKO for the purchase of the yacht GALACTICA STAR.

ALISON-MADUEKE:   If you want to hire a yacht, you lease it for two weeks or whatever. You don't go and sink funds into it at this time when Nigerian oil and gas sector is under all kinds of watch, as we have been for some time, and where Atlantic [*i.e.*, AEDC and/or AEBD] itself has been the subject of all kinds of speculation.

120.   Subsequently, ALISON-MADUEKE confronted ALUKO with rumors she had heard of his ability to blackmail her.

ALISON-MADUEKE:   I said tell him [*i.e.*, ALUKO] to bring everything out, and then you know what will happen? No problem, I will be happy to escort all of you to jail along with myself. I said, in fact, you'll be shocked by what I will do. Because when it comes to that, I will come out and tell the Nigerian people this is what happened.

Oh, yes, I will blame myself, but it [INAUDIBLE] place and everything. Anything they want to say, I am happy to go. But I will come out openly and say it so that they can judge me openly. And then all of us go and sit on the gate. Let us see who survived [INAUDIBLE], me or you.

121.   Later, ALISON-MADUEKE acknowledged the furniture purchased on her behalf, and indicated the total value of it could approach $4,000,000.

ALISON-MADUEKE:   The furniture they gave me didn't come to more than four million dollars, altogether. [INAUDIBLE] it is truth. I was with [INAUDIBLE].

**H.      Laundering of Corruptly Acquired Proceeds into and through the United States**

122.     Upon information and belief, AEDC and AEBD sold the oil-lifting allocations assigned to them under the Forcados and Brass SAAs to third-party oil trading companies and used the proceeds of those sales to purchase the Defendants *In Rem*.  The following paragraphs detail representative transactions in which AEDC and AEBD received payments from third-party traders in return for allocations of crude oil.

**(1)      Taleveras Payments**

123.     Shortly after the award of the Forcados SAAs, ALUKO began to receive at his personal LGT -090038 Account a stream of payments from the Taleveras Group of Companies and its affiliates, including Taleveras Trading Ltd. and Taleveras Petroleum Trading BV (collectively, "Taleveras").   Over the course of six months, these payments totaled nearly $15,000,000.

124.     Taleveras is a Nigerian-based oil trading company that was assigned the oil-lifting rights of companies controlled by CO-CONSPIRATORS #1 and #3.

125.     The founder and chairman of Taleveras is Igho Sanomi ("Sanomi").  Sanomi is also a director of and a 30% shareholder in Lengard Projects Ltd. ("Lengard"), a Nigerian corporation.  Notations recorded alongside the wires that Taleveras sent to ALUKO indicate the payments were made in connection with a joint venture between Lengard and AEDC concerning the Forcados SAAs.

126.     The Taleveras payments are summarized in Table 4 below.

| TABLE 4 | | | | |
|---|---|---|---|---|
| **Date** | **Amount** | **From** | **To** | **Remittance Notes** |
| July 12, 2011 | $1,500,000 | Taleveras Group of Cos. | ALUKO LGT -090038 Account | RFB LENGARD JVA |
| July 14, 2011 | $1,000,000 | Taleveras Group of Cos. | ALUKO LGT -090038 Account | FOR FIRST INSTALLMENT DUE |
| July 20, 2011 | $1,000,000 | Taleveras Trading Ltd. | ALUKO LGT -090038 Account | RFB JOINT CONRACT VENTURE WITH LENGARD PROJECT |
| Aug. 15, 2011 | $1,000,000 | Taleveras Group of Cos. | ALUKO LGT -090038 Account | JOINT VENTURE CONTRACT WITH LENGARD |
| Aug. 15, 2011 | $650,000 | Taleveras Group of Cos. | ALUKO LGT -090038 Account | JOINT VENTURE CONTRACT WITH LENGARD |
| Sept. 12, 2011 | $1,000,000 | Taleveras Trading Ltd. | ALUKO LGT -090038 Account | JOINT CONTRACT VENTURE WITH LENGARD PROJECT |
| Sept. 16, 2011 | $1,600,000 | Taleveras Trading Ltd. | ALUKO LGT -090038 Account | KOLA ALUKO AND LENGARD AGREEMENT |

| Oct. 5, 2011 | $1,500,000 | Taleveras Petroleum Trading BV | ALUKO LGT -090038 Account | REF KOLAWOLE ALUKO AND LENGARD PROJECTS AGREEMENT FOR OML |
| Oct. 11, 2011 | $500,000 | Taleveras Group of Cos. | ALUKO LGT -090038 Account | RFB PAYMENT FOR LENGARD JVA WITH KOLAWOLE ALUKO BEING JOIN CONTRACT BETWEEN LENGARD PROJECTS LTD AND MRKOLAWOLE ALUKO |
| Nov. 14, 2011 | $2,000,000 | Taleveras Group of Cos. | ALUKO LGT -090038 Account | RFB FINAL PAYMENT ON AGREEMENT FOR OMLS [BANK ACCOUNT NO.] |
| Dec. 7, 2011 | $1,600,000 | Taleveras Petroleum Trading BV | ALUKO LGT -090038 Account | REF KOLAWOLE ALUKO AND LENGARD PROJECTS AGREEEMENT FOR OML 30 34 42 26 |
| Jan. 3, 2012 | $600,000 | Taleveras Petroleum Trading BV | ALUKO LGT -090038 Account | REF FINAL PAYMENT VENTURE LENGARD PROJECTS LTD |
| Jan. 10, 2012 | $1,000,000 | Taleveras Petroleum Trading BV | ALUKO LGT -090038 Account | REF FINAL PAYMENT KOLAWOLE ALUKO AND LENGARD PROJECTS AGREEMENT FOR OML 30 34 42 26 |
| **TOTAL** | **$14,950,000** | | | |

127.     Upon information and belief, the sums identified in Table 4 were paid to ALUKO in return for an assignment to Taleveras and/or Lengard of AEDC's rights to lift oil under the corruptly acquired Forcados SAAs.

32

128. Each of the transactions identified in Table 4 were transferred into and out of correspondent bank accounts at a financial institution which processes its U.S. dollar wire transactions through Newark, N.J.

**(2) Arcadia Payments**

129. Upon information and belief, AEDC entered into an agreement with the Arcadia Group and/or its affiliates and subsidiaries (collectively "Arcadia"), according to which Arcadia loaned money to AEDC.[2] In return, Arcadia was repaid with assignments of AEDC's crude oil liftings under the Forcados SAAs.

130. In particular, two months after the last payment from Taleveras, as detailed above, Arcadia Energy (Suisse) SA and Arcadia Petroleum Ltd. began making payments to an account held in the name of AEH at LGT Bank (Schweiz) AG ending in -108031 (the "LGT -108031 Account"). These payments are summarized in Table 5 below.

| TABLE 5 | | | |
|---|---|---|---|
| **Date** | **Amount** | **From** | **To** |
| Apr. 18, 2012 | $10,000,000.00 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| May 14, 2012 | $1,240,636.73 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| June 26, 2012 | $4,182,119.86 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| July 23, 2012 | $2,369,202.26 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| July 24, 2012 | $1,275,896.52 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |

---

[2] According to its website, Arcadia is a "global commodity trading firm covering oil, agricultural, gas and power markets."

| Aug. 17, 2012 | $2,962,828.96 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
|---|---|---|---|
| Sept. 17, 2012 | $25,000,000.00 | Arcadia Petroleum Ltd. | AEH LGT -108031 Account |
| Sept. 17, 2012 | $25,000,000.00 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| Sept. 18, 2012 | $2,091,915.00 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| Jan. 8, 2013 | $23,419,427.59 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| Jan. 10, 2013 | $1,603,484.35 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| Feb. 4, 2013 | $2,000,000.00 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| Feb. 15, 2013 | $1,114,975.99 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| Feb. 21, 2013 | $6,000,000.00 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| Feb. 27, 2013 | $1,750,000.00 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| **TOTAL** | **$110,010,487.26** | | |

131.    Each of the transactions identified in Table 5 were transferred into and out of correspondent bank accounts at a financial institution which processes its U.S. dollar wire transactions through Stamford, Conn.

**(3)    Glencore Payments**

132.    As described above, *supra* ¶ 115, AEBD sold to Glencore more than 7,000,000 barrels of crude oil acquired through the Brass SAA.  Glencore's payments for these allotments

34

were made: (i) to an account in the name of AEBD ending in -184001 at Deutsche Bank (Suisse) SA (the "DB -184001 Account"); (ii) to an account ending in -630350 in the name of AEBD at Standard Chartered Bank London (the "SCB -630350 Account"); (iii) to an account in the name of AEBD ending in -677644 at Standard Chartered Bank London (the "SCB -677644 Account"); and (iv) to an account ending in -9941 in the name of AEBD at Stanbic IBTC (Nigeria) (the "SIBTC -9941 Account").  These payments are summarized in Table 6 below.

| TABLE 6 | | | |
|---|---|---|---|
| __Date__ | __Amount__ | __From__ | __To__ |
| Apr. 5, 2013 | $83,698,030.50 | Glencore | AEBD SCB -630350 Account |
| June 14, 2013 | $11,135,517.30 | Glencore | AEBD SIBTC -9941 Account |
| June 20, 2013 | $80,550,041.30 | Glencore | AEBD SCB -677644 Account |
| July 11, 2013 | $79,408,556.24 | Glencore | AEBD SIBTC -9941 Account |
| July 13, 2013 | $19,825,640.43 | Glencore | AEBD SCB -677644 Account |
| July 19, 2013 | $19,570,062.69 | Glencore | AEBD SIBTC -9941 Account |
| July 25, 2013 | $83,489,717.99 | Glencore | AEBD SIBTC -9941 Account |
| Aug. 16, 2013 | $20,622,648.97 | Glencore | AEBD SIBTC -9941 Account |
| Sept. 24, 2013 | $39,900,000.00 | Glencore | AEBD DB -184001 Account |
| Oct. 11, 2013 | $39,900,000.00 | Glencore | AEBD SIBTC -9941 Account |

| Oct. 11, 2013 | $44,357,752.55 | Glencore | AEBD SIBTC -9941 Account |
|---|---|---|---|
| Oct. 25, 2013 | $20,696,220.17 | Glencore | AEBD SIBTC -9941 Account |
| Nov. 1, 2013 | $43,817,618.34 | Glencore | AEBD DB -184001 Account |
| Nov. 8, 2013 | $20,225,853.91 | Glencore | AEBD SIBTC -9941 Account |
| Nov. 26, 2013 | $39,900,000.00 | Glencore | AEBD SIBTC -9941 Account |
| Jan. 15, 2014 | $42,696,761.51 | Glencore | AEBD SIBTC -9941 Account |
| Jan. 23, 2014 | $20,172,151.70 | Glencore | AEBD SIBTC -9941 Account |
| Mar. 20, 2014 | $83,159,960.00 | Glencore | AEBD SIBTC -9941 Account |
| Apr. 8, 2014 | $18,171,349.51 | Glencore | AEBD SIBTC -9941 Account |
| **TOTAL** | **$811,297,883.11** | | |

133.    Each of the transactions identified in Table 6 was transferred into and out of correspondent bank accounts at financial institutions which process their U.S. dollar wire transactions through Newark, N.J., and Jersey City, N.J.

134.    Of the amounts Glencore paid into AEBD's SIBTC -9941 Account, significant amounts were subsequently transferred into (i) AEH's LGT -108031 Acount; (ii) an account held in the name of Atlantic Energy DMCC at LGT Bank (Schweiz) AG ending in -822048 (the "LGT -822048 Account"); (iii) the DB -184001 Account; and (iv) an account held in the name of Atlantic

Energy SA at LGT Bank (Schweiz) AG ending in -431046 (the "LGT -431046 Acount").  These

transfers are summarized in Table 7 below:

| TABLE 7 | | | |
|---|---|---|---|
| **Date** | **Amount** | **From** | **To** |
| July 15, 2013 | $49,408,556.24 | AEBD SIBTC -9941 Account | AEH LGT -108031 Account |
| July 25, 2013 | $19,500,000.00 | AEBD SIBTC -9941 Account | AEH LGT -108031 Account |
| July 31, 2013 | $83,482,367.99 | AEBD SIBTC -9941 Account | AEH LGT -108031 Account |
| Aug. 26, 2013 | $7,000,000.00 | AEBD SIBTC -9941 Account | AEH LGT -108031 Account |
| Oct. 18, 2013 | $81,000,000.00 | AEBD SIBTC -9941 Account | AEH LGT -108031 Account |
| Oct. 23, 2013 | $1,000,000.00 | AEBD SIBTC -9941 Account | AE DMCC LGT -822048 Account |
| Oct. 23, 2013 | $300,000.00 | AEBD SIBTC -9941 Account | AE SA LGT -431046 Account |
| Nov. 15, 2013 | $19,900,000.00 | AEBD SIBTC -9941 Account | AEH LGT -108031 Account |
| Nov. 29, 2013 | $300,000.00 | AEBD SIBTC -9941 Account | AE SA LGT -431046 Account |
| Dec. 4, 2013 | $299,960.00 | AEBD SIBTC -9941 Account | AE SA LGT -431046 Account |
| Mar. 26, 2014 | $10,000,000.00 | AEBD SIBTC -9941 Account | AEBD DB -184001 Account |
| **TOTAL** | **$272,190,884.23** | | |

135.    Each of the transactions identified in Table 7 was transferred into and out of correspondent bank accounts at a financial institution which processes its U.S. dollar wire transactions through Jersey City, N.J.

I.    **The Purchase of Defendants *In Rem***

136.    Purchases made by or for ALUKO's benefit during the period of the SAAs grossly outstrip his known net worth and legitimate income.  Although Aluko once owned an oil-trading company in Nigeria, he was known as a small-time trader.  Likewise, between 2007 and 2011, Aluko was employed by Seven Energy International Ltd. where his annual salary was only approximately $500,000, plus bonus.

137.    Nevertheless, as detailed below, during the period from March 2012 through January 2015, ALUKO purchased more than $87 million dollars' worth of real property in the United States and an $82 million luxury yacht.

138.    Upon information and belief, ALUKO, OMOKORE, and others transferred the proceeds of the Forcados and Brass SAAs into accounts held in their names or in the names of entities under their control and laundered these proceeds into and through the United States, including for the purchase of the Defendants *In Rem*.

    **(1)    815 CIMA DEL MUNDO ROAD**

139.    On or about July 3, 2012, ALUKO wired $645,000 from his LGT -090038 Account to Chicago Title Co. for the purchase of the Defendant *In Rem* 815 CIMA DEL MUNDO ROAD. On or about August 2, 2012, ALUKO wired an additional $22,868,000 from his LGT -090038 Account to Chicago Title Co. to complete the purchase.

140.    Although the funds used to purchase 815 CIMA DEL MUNDO ROAD were wired in ALUKO's name, the property was titled in the name of Wamdara, Inc., a California corporation

that was registered on July 30, 2012, *i.e.*, three days before the sale closed.  Wamdara, Inc., is a wholly owned subsidiary of EARNSHAW.

### (2)   807 CIMA DEL MUNDO ROAD

141.    One month after the purchase of 815 CIMA DEL MUNDO ROAD, on or about September 28, 2012, ALUKO wired $200,000 from his LGT -090038 Account to Chicago Title Co. for the purchase—in the name of Wamdara, Inc.—of the Defendant *In Rem* 807 CIMA DEL MUNDO ROAD.

142.    On or about November 7, 2012, EARNSHAW wired $6,088,115 from an account ending in -525036 held in its name at LGT Bank (Schweiz) AG in Switzerland (the "LGT -525036 Account") to an account held at City National Bank in the name of Canon Business Properties,[3] for the benefit of Wamdara, Inc.  On or about the next day, November 8, 2012, Canon Business Properties wired $6,087,962.24 to Chicago Title Co. to complete the purchase of 807 CIMA DEL MUNDO ROAD.

143.    Although the funds used to purchase 807 CIMA DEL MUNDO ROAD were wired in the name of ALUKO and EARNSHAW, the property was titled in the name of Wamdara, Inc., a California corporation that, as noted above, was previously registered in connection with the purchase of 815 CIMA DEL MUNDO ROAD and is a wholly owned subsidiary of EARNSHAW.

### (3)   1049 FIFTH AVENUE UNITS

144.    On or about July 5, 2013, ALUKO wired $8,250,000 from his LGT -090038 Account to an account held at City National Bank in the name of Canon Business Properties, for the benefit of 1049 5th Avenue, Inc.  Three days later, on or about July 8, 2013, Canon Business

---

[3] Canon Business Properties is a property management company located in Beverly Hills, Calif.

Properties wired $8,240,000 to Peninsula Abstract LLC, a title company operating in Bayside, N.Y., for the purchase of the Defendant *In Rem* 1049 FIFTH AVENUE UNITS.

145.    Although the funds used to purchase the 1049 FIFTH AVENUE UNITS came from the LGT -090038 Account held in ALUKO's name, the property was titled in the name of 1049 5th Avenue, Inc., a New York corporation that was registered on May 15, 2013, *i.e.*, two months before the $8,250,000 wire was sent.  1049 5th Avenue, Inc., is a wholly owned subsidiary of EARNSHAW.

**(4)    157 WEST 57TH STREET SURPLUS PROCEEDS**

146.    On or about August 20, 2012, ALUKO wired $10,000,000 from his LGT -090038 Account to an escrow account for the purchase of real property at 157 West 57th Street, Unit 79, New York, New York 10019 (the "157 West 57th Street Unit").  On or about February 27, 2013, ALUKO wired an additional $2,500,000 from his LGT -090038 Account to the same escrow account.

147.    On or about December 4, 2014, EARNSHAW wired $34,744,000 from the LGT -525036 Account to Peninsula Abstract LLC; however, Peninsula Abstract's bank, Sterling National Bank, declined the transaction and the funds were returned.

148.     Four days later, on or about December 8, 2014, EARNSHAW wired $34,744,000 from its LGT -525036 Account directly to Extell West 57th Street, LLC, which was the developer for the building at 157 West 57th Street.

149.    On or about January 5, 2015, EARNSHAW wired an additional $1,500,000 from its LGT -525036 Account to Extell West 57th Street.

150.    Although the funds used to purchase the 157 West 57th Street Unit came from the LGT -090038 Account held in ALUKO's name, along with the LGT -525036 Account held in

EARNSHAW's name, the property was titled in the name of One57 79 Inc., a New York corporation that was registered on January 10, 2014, *i.e.*, five days after the final $1,500,000 wire was sent.  One57 79 Inc. is a wholly owned subsidiary of EARNSHAW.

151.    On or about September 3, 2015, EARNSHAW entered into a loan agreement with Banque Havilland relating to a €25,000,000 loan facility (the "Banque Havilland Loan").  As security for the Banque Havilland Loan, EARNSHAW pledged the GALACTICTA STAR.  As further security, on or about September 9, 2015, One57 79 Inc. undertook to guarantee EARNSHAW's obligations under the Banque Havilland Loan and, in support thereof, executed a mortgage over the 157 West 57th Street Unit in Banque Havilland's favor.

152.    Pursuant to the terms of the Banque Havilland Loan, EARNSHAW agreed to pay interest on the loan monthly and to repay the loan in full by September 5, 2016.  Upon information and belief, EARNSHAW failed to make its required interest payment in September 2016 and has failed to repay the €25,000,000 principal.  These failures constituted an event of default under the Banque Havilland Loan.

153.    In light of the default, on or about January 26, 2017, Banque Havilland initiated a foreclosure action against One57 79 Inc. in New York State Supreme Court.

154.    On or about April 3, 2017, One57 79 Inc. and Banque Havilland entered into a Stipulation of Settlement and Consent to the Immediate Entry of Judgment of Foreclosure (the "Stipulation of Settlement"), under which One57 79 Inc. acknowledged the fact of EARNSHAW's default and consented to the immediate entry of a judgment of foreclosure.  As part of the Stipulation of Settlement, One57 79 Inc. waived its rights to make any motion or application in the foreclosure proceedings other than "to make a claim pursuant to RPAPL § 1361 for any surplus

monies from foreclosure sale of the Mortgaged Premises that are deposited with the Court by the Referee after payment" of amounts owed to Banque Havilland.

155.    On or about May 25, 2017, the Hon. Arlene P. Bluth, Justice of the New York Supreme Court, entered a Judgment of Foreclosure and Sale (the "Judgment") pursuant to which the 157 West 57th Street Unit is now set for public auction on or about July 19, 2017, in Room 130 of the Courthouse located at 60 Centre Street, New York, N.Y. 10007.

156.    Per the terms of the Judgment, proceeds of the auction are to be paid out in order to cover any "taxes, assessments, sewer, rents or water rates which are or may become liens on the premises," the costs of the sale, the referee's fee, and the amounts due to Banque Havilland.  Any surplus remaining after settlement of the foregoing amounts is to be deposited with the New York County Clerk.

157.    Upon information and belief, One57 79 Inc. is entitled to file a claim, pursuant to N.Y. Real Prop. Acts. Law § 1361, for any such surplus deposited with the New York County Clerk.  Such surplus monies payable or owed to One57 79 Inc. constitute the Defendant *In Rem* identified as the 157 WEST 57TH STREET SURPLUS PROCEEDS.

**(5)    GALACTICA STAR**

158.    On or about April 5, 2013, Glencore wired $83,698,030.50 from its account at Credit Suisse AG to AEBD's SCB -630350 Account in London.  *See supra* Table 6.  Just four days later, on April 9, AEBD transferred $74,400,000 to the LGT -822048 Account for the benefit of AEH.

159.    On or about June 20, 2013, Glencore wired an additional $80,550,041.30 from its account at Credit Suisse AG to AEBD's SCB -630350 Account.  The following day, on or about June 21, 2013, AEBD wired $64,000,000 to AEH's LGT -108031 Account.

160.    Upon information and belief, out of such funds deposited in the LGT -822048 Account and the LGT -108031 Account, approximately $82,000,000 was subsequently transferred to ALUKO's LGT -090038 Account through an intrabank transfer.  ALUKO then used these funds to purchase the Defendant *In Rem* GALACTICA STAR in the name of EARNSHAW between July and September 2013.

161.    Upon information and belief, the purchase of the GALACTICA STAR was brokered by Stenham Trustees Ltd., of the Bailiwick of Guernsey.

162.    Furthermore, upon purchasing the GALACTICA STAR, ALUKO, acting through EARNSHAW, leased a berth at Marina Port Vell in Barcelona, Spain.  The berthing lease was executed on or about October 2, 2013, between EARNSHAW and Marina Port Vell S.A.U. According to Marina Port Vell's website, it is a "world-class home port for superyachts."

163.    Subsequently, on or about April 3, 2015, a company called Mez Investments, Inc., wired $400,000 from an account at Farmers & Merchants Bank to Nigel Burgess Ltd.  Mez Investments, Inc., was a wholly owned subsidiary of EARNSHAW incorporated in California. Accompanying the wire was the notation, "Man Galactica Star."  This notation is a reference to Nigel Burgess Ltd.'s management contract for the GALACTICA STAR.

164.    Similarly, on or about March 10, 2016, another company wholly owned by EARNSHAW, Dame Investments, Inc., wired €430,000 to Nigel Burgess Ltd.  This wire, too, contained the notation, "Man Galactica Star."

(6)    **CROSS HOLDINGS PROMISSORY NOTE**

165.    On or about June 12, 2015, ALUKO, acting on behalf of TENKA, signed a letter of intent addressed to Cross Holdings, Inc.[4] ("Cross Holdings"), in which TENKA committed to loan $6,000,000 to Cross Holdings, which loan would later be convertible into shares of Cross Holdings common stock.  The conversion of the loan into common stock was contingent on TENKA's later investment of an additional $22,000,000 in Cross Holdings.

166.    Subsequently, TENKA assigned its rights and responsibilities under the letter of intent to Rivermount International Ltd. ("Rivermount"), a special-purpose vehicle registered in the British Virgin Islands and set up to carry out the transactions contemplated in the letter of intent.

167.    On or about July 15, 2015, Rivermount and Cross Holdings executed the Defendant *In Rem* CROSS HOLDINGS PROMISSORY NOTE.  The CROSS HOLDINGS PROMISSORY NOTE formalizes the letter of intent, with some modifications to the payment schedules.  Under the CROSS HOLDINGS PROMISSORY NOTE, Rivermount was to loan $16,000,000 to Cross Holdings, payable in three tranches:  (i) $2,000,000 on July 15, 2015; (ii) $6,000,000 on September 11, 2015; and (iii) $10,000,000 on or before March 31, 2016.  The loan was convertible into Cross Holdings common stock upon an additional investment from Rivermount of $12,000,000 on or before March 31, 2017.

168.    On July 15, 2015, Arcadia Global Assets Ltd. paid $1,999,965 to Cross Holdings as the first loan installment under the CROSS HOLDINGS PROMISSORY NOTE.

---

[4] According to its website, Cross Holdings is a "deepwater intervention and support company" supporting the "marine and offshore industry."

169.     On September 11, 2015, EARNSHAW wired $4,000,000 to Cross Holdings as the second loan installment under the CROSS HOLDINGS PROMISSORY NOTE.   Upon information and belief, EARNSHAW obtained this $4,000,000 from the Banque Havilland Loan.

170.     On March 11, 2016, Wamdara, Inc., wired $10,000,000 to Cross Holdings as the third installment under the CROSS HOLDINGS PROMISSORY NOTE.  As detailed above, Wamdara, Inc., is a wholly owned subsidiary of EARNSHAW.  Upon information and belief, this $10,000,000 was obtained through a loan from Farmers & Merchants Bank, against which Wamdara, Inc., pledged as security 815 CIMA DEL MUNDO ROAD.

171.     Upon information and belief, Cross Holdings has never repaid the $16,000,000 in loan proceeds to Rivermount or any of its affiliated companies (including TENKA, EARNSHAW, or Wamdara, Inc.).  Upon information and belief, the loan proceeds have not been converted into Cross Holdings common stock.  Therefore, as detailed in the CROSS HOLDINGS PROMISSORY NOTE, Rivermount's rights and interests in the note entitle it, among other things, to repayment of the loan principal, plus all accrued interest, upon demand.

### FIRST CLAIM FOR FORFEITURE

172.     The United States incorporates by reference ¶¶ 1 through 171 above as if fully set forth herein.

173.     Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity'" is subject to forfeiture to the United States.

174.     "Specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv), and 1956(c)(7)(D) to include, among other things, (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public

45

official"; (ii) foreign offenses involving bribery of a public official; (iii) interstate transportation of stolen or fraudulently obtained property (18 U.S.C. § 2314); (iv) interstate receipt of stolen property (18 U.S.C. § 2315); (v) wire fraud (18 U.S.C. § 1343); and any felony violation of the FCPA (15 U.S.C. § 78dd-1 *et seq.*).

175.    As set forth above, the Defendants *In Rem* constitute or are derived from proceeds traceable to bribery of a public official or the misappropriation, theft, or embezzlement of public funds for the benefit of a public official, in violation of the laws of Nigeria, as well as from proceeds traceable to the interstate transportation or receipt of property stolen or taken by fraud, to wire fraud, and to felony violations of the FCPA or to a conspiracy to commit one of the foregoing offenses.

176.    Therefore, the Defendants *In Rem* are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that they constitute or are derived from proceeds traceable to a specified unlawful activity or a conspiracy to commit a specified unlawful activity.

## SECOND CLAIM FOR FORFEITURE

177.    The United States incorporates by reference ¶¶ 1 through 171 above as if fully set forth herein.

178.    Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1957], or any property traceable to such property" is subject to forfeiture to the United States.

179.    Section 1957 imposes criminal penalties on any person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 [that] is derived from specified unlawful activity."

180.    For purposes of § 1957, "specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv), and 1956(c)(7)(D) to include, among other things, (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (ii) foreign offenses involving bribery of a public official; (iii) interstate transportation of stolen or fraudulently obtained property (18 U.S.C. § 2314); (iv) interstate receipt of stolen property (18 U.S.C. § 2315); (v) wire fraud (18 U.S.C. § 1343); and any felony violation of the FCPA (15 U.S.C. § 78dd-1 *et seq.*).

181.    As set forth above, the Defendants *In Rem* were involved in, or are traceable to, monetary transactions or attempted monetary transactions involving criminally derived property of a value greater than $10,000 and, as detailed above, the funds involved in those transactions were derived from specified unlawful activity, including bribery of a public official or the misappropriation, theft, or embezzlement of public funds for the benefit of a public official, in violation of the laws of Nigeria; the interstate transportation or receipt of property stolen or taken by fraud; wire fraud; felony violations of the FCPA; or to a conspiracy to commit one of the foregoing offenses.

182.    Therefore, the Defendants *In Rem* are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that they were involved in or are traceable to transactions or attempted transactions in violation of 18 U.S.C. § 1957.

## THIRD CLAIM FOR FORFEITURE

183.    The United States incorporates by reference ¶¶ 1 through 171 above as if fully set forth herein.

184.   Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956], or any property traceable to such property" is subject to forfeiture to the United States.

185.   Section 1956(a)(1) imposes criminal penalties on any person who:

knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity --

. . .

(B) knowing that the transaction is designed in whole or in part --

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

186.   For purposes of § 1956, "specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv), and 1956(c)(7)(D) to include, among other things, (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (ii) foreign offenses involving bribery of a public official; (iii) interstate transportation of stolen or fraudulently obtained property (18 U.S.C. § 2314); (iv) interstate receipt of stolen property (18 U.S.C. § 2315); (v) wire fraud (18 U.S.C. § 1343); and any felony violation of the FCPA (15 U.S.C. § 78dd-1 *et seq.*).

187.   As set forth above, the Defendants *In Rem* were involved in, or are traceable to, financial transactions or attempted financial transactions involving funds derived from specified unlawful activity, including bribery of a public official or the misappropriation, theft, or embezzlement of public funds for the benefit of a public official, in violation of the laws of Nigeria; the interstate transportation or receipt of property stolen or taken by fraud; wire fraud; felony violations of the FCPA; or to a conspiracy to commit one of the foregoing offenses.

48

188.    As further set forth above, the transactions were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity by, among other things, funneling the funds through multiple bank accounts held in the names of disparate entities and, subsequently, titling the assets in the name of shell companies.

189.    Therefore, the Defendants *In Rem* are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that they were involved in violations of 18 U.S.C. § 1956(a)(1)(B)(i) or are traceable to such property.

## FOURTH CLAIM FOR FORFEITURE

190.    The United States incorporates by reference ¶¶ 1 through 171 above as if fully set forth herein.

191.    Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956], or any property traceable to such property" is subject to forfeiture to the United States.

192.    Section 1956(a)(2) imposes criminal penalties on any person who:

> Transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States --
>
> . . .
>
> > (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part --
> >
> > > (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

193.    For purposes of § 1956, "specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv), and 1956(c)(7)(D) to include, among other things, (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (ii) foreign offenses involving bribery of a public official; (iii) interstate transportation of stolen or fraudulently obtained property (18 U.S.C. § 2314); (iv) interstate receipt of stolen property (18 U.S.C. § 2315); (v) wire fraud (18 U.S.C. § 1343); and any felony violation of the FCPA (15 U.S.C. § 78dd-1 *et seq.*).

194.    As set forth above, the Defendants *In Rem* were involved in, or are traceable to, the transportation, transmission, or transfer of funds to a place in the United States from or through a place outside the United States or to a place outside the United States from or through a place in the United States, in which such funds were derived from specified unlawful activity, including bribery of a public official or the misappropriation, theft, or embezzlement of public funds for the benefit of a public official, in violation of the laws of Nigeria; the interstate transportation or receipt of property stolen or taken by fraud; wire fraud; felony violations of the FCPA; or to a conspiracy to commit one of the foregoing offenses.

195.    As further set forth above, such transportation, transmissions, or transfers were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity by, among other things, funneling the funds through multiple bank accounts held in the names of disparate entities and, subsequently, titling the assets in the name of shell companies.

196.    Therefore, the Defendants *In Rem* are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that they were involved in violations of 18 U.S.C. § 1956(a)(2)(B)(i) or are traceable to such property.

## FIFTH CLAIM FOR FORFEITURE

197.     The United States incorporates by reference ¶¶ 1 through 196 above as if fully set forth herein.

198.     Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956 or 1957], or any property traceable to such property" is subject to forfeiture to the United States.

199.     Section 1956(h) imposes criminal penalties on any person who "conspires to commit any offense defined in [18 U.S.C. § 1956 or 1957]."

200.     As set forth above, the Defendants *In Rem* were involved in or were the subjects of a conspiracy to conduct, or attempt to conduct, transactions in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), and/or 1957, which transactions involved the proceeds of, or property traceable to the proceeds of, specified unlawful activity, including, among other things, (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (ii) foreign offenses involving bribery of a public official; (iii) interstate transportation of stolen or fraudulently obtained property (18 U.S.C. § 2314); (iv) interstate receipt of stolen property (18 U.S.C. § 2315); (v) wire fraud (18 U.S.C. § 1343); and any felony violation of the FCPA (15 U.S.C. § 78dd-1 *et seq.*).

201.     Accordingly, the Defendants *In Rem* are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A) on the grounds that they constitute property involved in a conspiracy or conspiracies to violate 18 U.S.C. §§ 1956 and/or 1957, all in violation of 18 U.S.C. § 1956(h) or are traceable to such property.

## CLAIM FOR RELIEF

**WHEREFORE** Plaintiff, the United States, requests as follows:

(1)     That the Court enter judgment against the Defendants *In Rem*, and in favor of the United States, on all claims alleged in the Complaint.

(2)     That the Court issue process to enforce the forfeiture of the Defendants *In Rem*, requiring all persons having an interest in the Defendants *In Rem* be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendants *In Rem* to the United States of America for disposition according to law; and

(3)     That the Court grant the United States such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated:  July 14, 2017

Respectfully submitted,

DEBORAH CONNOR, ACTING CHIEF
MONEY LAUNDERING AND ASSET
   RECOVERY SECTION (MLARS)


By:      <u>  /s/ *Michael W. Khoo*          </u>
          MARY BUTLER
          Chief, MLARS-International Unit
          STEPHEN CAMPBELL
          Deputy Chief, MLARS-IU
          STEPHEN A. GIBBONS (DC Bar No. 493719)
          MICHAEL W. KHOO (DC Bar No. 997796)
          Trial Attorneys, MLARS-IU
          United States Department of Justice
          1400 New York Avenue, NW
          Bond Building, Suite 10100
          Washington, DC  20005
          Telephone:  (202) 514-1263
          Facsimile:  (202) 616-2547
          Email:        stephen.gibbons@usdoj.gov
                         michael.khoo@usdoj.gov

          Attorneys for Plaintiff
          UNITED STATES OF AMERICA

## **VERIFICATION**

I, ELIZABETH CRISPINO, a Special Agent with the Federal Bureau of Investigation ("FBI"), hereby verify and declare under penalty of perjury that I have read the foregoing Verified Complaint *In Rem* and know the contents thereof, and that the factual statements contained in the Verified Complaint are true to my own knowledge, except those factual statements herein stated to be alleged on information and belief and as to those factual statements I believe them to be true. In signing this verification I am not opining on any legal theories or conclusions contained herein.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent of FBI. This Verified Complaint does not set forth each and every fact learned during the course of this investigation or known to the United States but rather only contains those factual statements necessary to establish, by a preponderance of the evidence, that the Defendant Properties are subject to forfeiture. The dates and amounts referred to in this Verified Complaint are approximate. The names referenced may have alternate spellings in original and translated documents.

I hereby verify and declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on this 14th day of July 2017.

ELIZABETH CRISPINO
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION